# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SCOTT NAGO, in his Official Capacity as Chief Election Officer for the State of Hawai'i,<br><br>Defendant. | No. 1:25-cv-00522-LEK-RT<br><br>**MEMORANDUM IN SUPPORT OF MOTION**<br><br>Judge: Hon. Leslie E. Kobayashi |

**MEMORANDUM IN SUPPORT OF MOTION**

# TABLE OF CONTENTS

I.    BACKGROUND ...................................................................................2

    A.    Legal Background ....................................................................2

    B.    Factual and Procedural Background .......................................4

II.    LEGAL STANDARD ........................................................................6

III.    ARGUMENT....................................................................................7

    A.    The United States fails to state a claim under Title III of the CRA. ....7

        1.    The United States did not state a basis for its demand. ..............7

        2.    The United States' stated purpose was insufficient. ................10

        3.    The United States may be misstating its purpose. ...................14

        4.    This Court must ensure compliance with Title III....................16

    B.    The relief sought is beyond the bounds of Title III. ..........................18

    C.    State law bars the United States' demand. .........................................20

    D.    The United States' demand violates federal privacy laws. ...............21

        1.    The demand violates the Privacy Act. ......................................22

        2.    The demand violates the E-Government Act...........................24

        3.    The demand violates the Driver's Privacy Protection Act. ......24

IV.    CONCLUSION..............................................................................25

# TABLE OF AUTHORITIES

## Cases

*Alabama ex rel. Gallion v. Rogers*,
  187 F. Supp. 848 (M.D. Ala. 1960) ........................................................12

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
  570 U.S. 1 (2013) ................................................................... 2, 21

*Buckley v. Am. Const. L. Found., Inc.*,
  525 U.S. 182 (1999) ...............................................................23

*Bufkin v. Collins*,
  604 U.S. 369 (2025) ..................................................................7

*Coleman v. Kennedy*,
  313 F.2d 867 (5th Cir. 1963) ....................................................7

*Confederated Tribes & Bands of Yakama Nation v. Yakima County*,
  963 F.3d 982 (9th Cir. 2020) ....................................................7

*County of Amador v. U.S. Dep't of the Interior*,
  872 F.3d 1012 (9th Cir. 2017) .................................................11

*Crooks v. Harrelson*,
  282 U.S. 55 (1930) ..................................................................7

*Detwiler v. Mid-Columbia Med. Ctr.*,
  156 F.4th 886 (9th Cir. 2025) .............................................. 6-7

*Doe v. Kamehameha Schs./Bernice Pauahi Bishop Estate*,
  470 F.3d 827 (9th Cir. 2006) (en banc) ..................................11

*Ex parte Siebold*,
  100 U.S. 371 (1880) ................................................................21

*Gonzalez v. Arizona*,
  677 F.3d 383 (9th Cir. 2012) (en banc) ............................. 2, 21

*In re Coleman*,
  208 F. Supp. 199 (S.D. Miss. 1962) .................................. 7, 9, 13, 17

*Kennedy v. Bruce*,
  298 F.2d 860 (5th Cir. 1962) ........................................................... 13, 17

*Kennedy v. Lynd*,
  306 F.2d 222 (5th Cir. 1962) ........................................................ *passim*

*Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nickels*,
  150 F.4th 1260 (9th Cir. 2025) ......................................................... 9, 10

*Public Interest Legal Found., Inc. v. Bellows*,
  92 F.4th 36 (1st Cir. 2024).....................................................................21

*Ritter v. United States*,
  177 Fed. Cl. 84 (2025) ...........................................................................22

*U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*,
  931 F.3d 966 (9th Cir. 2019) ................................................................21

*United States v. Benson*,
  No. 1:25-cv-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026)............... 2, 9, 19

*United States v. Oregon*,
  No. 6:25-cv-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026)............... *passim*

*United States v. Powell*,
  379 U.S. 48 (1964)............................................................................ 17, 18

*United States v. Thomas*,
  No. 3:26-cv-00021-KAD (D. Conn. Jan. 14, 2026) .............................................18

*United States v. Weber*,
  No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807
  (C.D. Cal. Jan. 15, 2026) ................................................................. *passim*

**Federal Constitution, Statutes and Legislation**

U.S. Const. art. I, § 4, cl. 1 ...................................................................2

Privacy Act, 5 U.S.C. § 552a.......................................................... 6, 22, 23

18 U.S.C. § 2721(b)(1) ........................................................................25

18 U.S.C. § 2721(c) ....................................................................... 24-25

18 U.S.C. § 2725(3) ................................................................... 24-25

26 U.S.C. § 7604(a) .......................................................................17

National Voter Registration Act of 1993 (NVRA), 52 U.S.C. §§ 20501–
    20511 ........................................................................... 3, 5, 13

Title III of the Civil Rights Act of 1960 (CRA), 52 U.S.C. §§ 20701–
    20706 ............................................................................. *passim*

Help America Vote Act of 2002 (HAVA), 52 U.S.C. §§ 20901–21145 ........... *passim*

H.R. Rep. No. 86-956, at 7 (1959) ...............................................12

106 Cong. Rec. 5,208 (1960) .......................................................12

Pub. L. No. 107-347, § 208(b)(1), 116 Stat. 2899, 2921–22 (2002) ...........................24

**State Statutes**

Haw. Rev. Stat. § 11-1.5(a) ...........................................................5

Haw. Rev. Stat. § 11-2(a) .............................................................5

Haw. Rev. Stat. § 11-2(c) .............................................................5

Haw. Rev. Stat. § 11-15(a) ...........................................................22

Haw. Rev. Stat. § 11-15(c) ...........................................................22

Haw. Rev. Stat. § 11-15.7(a) .........................................................25

Haw. Rev. Stat. § 11-15.7(c) .........................................................25

Haw. Rev. Stat. § 11-97 ..............................................................20

Haw. Rev. Stat. § 11-97(a) ...........................................................5

**Rules**

Haw. Admin. R. § 3-177-160(g) ................................................ 5, 20

**Other Authorities**

*Basis*, Merriam-Webster Dictionary, https://www.merriam-
webster.com/dictionary/basis .......................................................................8

Kaylie Martinez-Ochoa et al., *Tracker of Justice Department Requests
for Voter Information*, Brennan Ctr. for Just. (updated Feb. 11, 2026),
https://www.brennancenter.org/our-work/research-reports/tracker-
justice-department-requests-voter-information .........................................4

Nick Corasaniti, *Trump's Call to 'Nationalize' Elections Adds to State
Officials' Alarm*, N.Y. Times (updated Feb. 5, 2026),
https://www.nytimes.com/2026/02/04/us/politics/trump-election-
states-midterms.html .................................................................................1

Press Release, Off. of Pub. Affs., U.S. Dep't of Just., Justice
Department Sues Virginia for Failure to Produce Voter Rolls (Jan. 16,
2026), https://www.justice.gov/opa/pr/justice-department-sues-
virginia-failure-produce-voter-rolls ..........................................................4

*Purpose*, Merriam-Webster Dictionary, https://www.merriam-
webster.com/dictionary/purpose ................................................................8

Special Message to the Congress on Civil Rights, 1 Pub. Papers 164,
166 (Feb. 5, 1959) ....................................................................................11

Statement by the President Upon Signing the Civil Rights Act of 1960, 1
Pub. Papers 398, 398 (May 6, 1960).......................................................12

## MEMORANDUM IN SUPPORT OF MOTION

Amid calls by President Trump to "nationalize" American elections,[1] the federal government is engaged in an "effort to receive the full voter registration files of millions of voters across the entire country[,]" *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807, at *4 (C.D. Cal. Jan. 15, 2026). The United States has now filed lawsuits against more than 20 states and the District of Columbia in an attempt to obtain their statewide voter registration lists, with its statements in and out of court "raising significant concerns" about the "true purpose" for which it is seeking this data. *United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026).

The United States' sole claim in this case is that Defendant Scott Nago, the Chief Election Officer for the State of Hawaiʻi, violated Title III of the Civil Rights Act of 1960 (CRA), 52 U.S.C. §§ 20701–20706, when he refused to turn over a complete, unredacted list of all of the State's registered voters in response to a written demand. Title III, a little-used provision of an Eisenhower-era civil rights statute, simply does not support the sweeping demand made in this case. It requires that a demand for records include "a statement of [its] basis and [its] purpose[,]" 52

---

[1]    Nick Corasaniti, *Trump's Call to 'Nationalize' Elections Adds to State Officials' Alarm*, N.Y. Times (updated Feb. 5, 2026), https://www.nytimes.com/2026/02/04/us/politics/trump-election-states-midterms.html.

U.S.C. § 20703, yet the demand in this case included no basis and an improper, if not outright contrived, purpose. Furthermore, "the records requested by the United States do not fall under the CRA's disclosure provision," *United States v. Benson*, No. 1:25-cv-1148, 2026 WL 362789, at *11 (W.D. Mich. Feb. 10, 2026), and to the extent they do, access is limited by state law. And on top of all that, the demand "violates a plethora of federal privacy laws[.]" *Weber*, 2026 WL 118807, at *17.

All this is not to say that the United States has no role in enforcing federal voter registration laws. But the demand the United States made here was both "unprecedented and illegal." *Id.* at *1. The Court should dismiss this case to protect Hawai'i residents' fundamental privacy and voting rights.

## I.    BACKGROUND

### A.    Legal Background

Under the Elections Clause, state governments have "the initial responsibility for regulating the mechanics of federal elections, but Congress is given the authority to 'make or alter' the states' regulations." *Gonzalez v. Arizona*, 677 F.3d 383, 390 (9th Cir. 2012) (en banc) (quoting U.S. Const. art. I, § 4, cl. 1), *aff'd sub nom. Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013). This case touches on three federal statutes that "create specific and narrow roles for the federal government in the states' regulation of elections[.]" *Oregon*, 2026 WL 318402, at *2.

"The Civil Rights Act of 1960 was a key follow up to the Civil Rights Act of 1957." *Id.* at *3. Title III of the CRA requires "[e]very officer of election" to "retain and preserve, for a period of twenty-two months from the date of" any election for federal office, "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election[.]" 52 U.S.C. § 20701. A "person having custody, possession, or control of such record[s] or paper[s]" must make them "available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative[,]" but only after receiving a "demand in writing" that "contain[s] a statement of the basis and the purpose therefor." *Id.* § 20703.

The National Voter Registration Act of 1993 (NVRA), 52 U.S.C. §§ 20501–20511, was enacted to "increase the number of eligible citizens who register to vote" and to "enhance[] the participation of eligible citizens as voters" while "protect[ing] the integrity of the electoral process" and "ensur[ing] that accurate and current voter registration rolls are maintained." *Id.* § 20501(b). It requires states to take certain measures to "ensure that any eligible applicant is registered to vote in an election" while also making "a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters[.]" *Id.* § 20507(a)(1), (4).

And the Help America Vote Act of 2002 (HAVA), 52 U.S.C. §§ 20901–21145, "established standards for states' voting systems and voter registration lists."

3

*Oregon*, 2026 WL 318402, at *3. It requires each state to administer and maintain a "single, uniform, official, centralized, interactive computerized statewide voter registration list . . . contain[ing] the name and registration information of every legally registered voter in the State[.]" 52 U.S.C. § 21083(a)(1)(A). State and local election officials must "perform list maintenance with respect to the computerized list on a regular basis[,]" *id.* § 21083(a)(2)(A), but "[t]he specific choices on the methods of complying" with the list requirements are "left to the discretion of the State[,]" *id.* § 21085.

### B.    Factual and Procedural Background

"Since May, the Justice Department has demanded that nearly every state and Washington, DC, hand over election-related records and data," including "full copies of statewide voter registration lists[.]"[2] The United States has sued 24 states and the District of Columbia for refusing to comply with its demands.[3] These demands and lawsuits seek "an unprecedented amount of personal information" about tens of millions of individual voters. *Weber*, 2026 WL 118807, at *1.

---

[2]    Kaylie Martinez-Ochoa et al., *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated Feb. 11, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information.

[3]    Press Release, Off. of Pub. Affs., U.S. Dep't of Just., Justice Department Sues Virginia for Failure to Produce Voter Rolls (Jan. 16, 2026), https://www.justice.gov/opa/pr/justice-department-sues-virginia-failure-produce-voter-rolls.

Defendant Scott Nago is Hawaii's Chief Election Officer. Compl., ECF No. 1, ¶ 8. In that capacity, he administers the State's Office of Elections, "supervise[s] all state elections[,]" and "maintain[s] data concerning registered voters, elections, apportionment, and districting." Haw. Rev. Stat. § 11-2(a), (c); *see also id.* § 11-1.5(a). And as Hawaii's "chief State election official," Defendant is responsible for maintaining the statewide voter registration list mandated by HAVA. 52 U.S.C. § 21083(a)(1)(A).

On September 8, 2025, the Department of Justice sent a letter to Defendant requesting an electronic copy of Hawaii's statewide voter registration list containing "*all fields*," including "the registrant's full name, date of birth, residential address, [and] his or her state driver's license number or the last four digits of the registrant's social security number[.]" ECF No. 5-2 at 2. The letter provided three sources of authority: Section 11 of the NVRA, Section 401 of HAVA, and Title III of the CRA. *Id.* at 2–3. After a citation to Title III, the letter stated that "[t]he purpose of this request is to ascertain Hawaii's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* at 3. However, the letter did not provide any information to indicate that Hawaiʻi is not in compliance with any federal law.

Defendant responded to the letter on September 22, 2025. Compl. ¶ 22. The response explained that state law, specifically Haw. Rev. Stat. § 11-97(a) and Haw. Admin. R. § 3-177-160(g), precluded him from complying with the request, and

stated that none of the federal statutes cited in the initial letter appeared to authorize the request or require Hawaiʻi to produce an electronic copy of its statewide voter registration list. Compl. ¶ 22; ECF No. 5-2 at 6–7. The response also questioned how the request complied with the Privacy Act, 5 U.S.C. § 552a, and expressed concern about reporting that the Department of Justice was attempting to establish a national voting database. *Id.* at 7–8.

After a brief exchange of emails on December 1 and 2, 2025, *see* Compl. ¶¶ 25–26; ECF No. 5-2 at 10, 12, the United States filed this suit. The United States no longer contends that the NVRA or HAVA give it the statutory authority to demand the State's complete, unredacted statewide voter registration list. *See* ECF No. 5-2 at 2–3. Instead, the United States rests its entire case on Title III of the CRA, which it alleges Defendant violated by refusing to produce records in response to the September 8, 2025 letter. Compl. ¶¶ 27–29. The United States requests a declaration to that effect, as well as an order requiring Defendant to provide an electronic copy of Hawaii's statewide voter registration list "with all fields[.]" *Id.* at 9.

## II.    LEGAL STANDARD

"Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint when a plaintiff's allegations fail to set forth a set of facts that, if true, would entitle the complainant to relief." *Detwiler v. Mid-Columbia Med. Ctr.*, 156 F.4th 886, 893 (9th Cir. 2025). "On a motion to dismiss, a court accepts as true a plaintiff's well-

pleaded factual allegations and construes all factual inferences in the light most favorable to the plaintiff." *Id.* "However, a court is not required to accept as true legal conclusions couched as factual allegations." *Id.*

## III.  ARGUMENT

### A.    The United States fails to state a claim under Title III of the CRA.

#### 1.    The United States did not state a basis for its demand.

The United States' demand for Hawaii's statewide voter registration list was insufficient because it failed to include a statement of its basis.

A demand for records under Title III "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. The use of "shall" indicates "a mandatory command[,]" *Bufkin v. Collins*, 604 U.S. 369, 379 (2025), and the use of "and" indicates that "not one or the other, but both" are required, *Confederated Tribes & Bands of Yakama Nation v. Yakima County*, 963 F.3d 982, 990 (9th Cir. 2020) (quoting *Crooks v. Harrelson*, 282 U.S. 55, 58 (1930)). Thus, the "basis" and "purpose" requirements are separate, and both are compulsory. The United States has long treated the two requirements this way. *See Kennedy v. Lynd*, 306 F.2d 222, 231 n.6 (5th Cir. 1962) (quoting a letter from the Attorney General stating both a basis and a purpose); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962) (same), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

At most, the September 8 letter included a statement of its purpose—although, as discussed below, its purported purpose failed to satisfy Title III—but included no statement of its basis. A "purpose" is "the reason something is done" or "the aim or goal of a person." *Purpose*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/purpose; *see Weber*, 2026 WL 118807, at *9 ("The purpose of a records request is the rationale for the request[.]"). Following a discussion of the Attorney General's authority under Title III, the September 8 letter stated: "*The purpose* of this request is to ascertain Hawaii's compliance with the list maintenance requirements of the NVRA and HAVA." ECF No. 5-2 at 3 (emphasis added); *see also* ECF No. 5-1 at 5 (identifying the same as stating the purpose of the demand), 12 (misquoting the letter, but identifying similar language as stating the purpose).

The demand, however, included no statement of its basis. A "basis" is "something on which something else is established or based." *Basis*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/basis. In other words, the basis is "the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law." *Weber*, 2026 WL 118807, at *9. For example, in two 1960s cases, the *purpose* of the Attorney General's demands was to ascertain whether there had been any violations of federal voting laws, but the *basis* for the demands was information showing that Southern counties had discriminated against

8

voters on the basis of race. *See Lynd*, 306 F.2d at 229 n.6; *Coleman*, 208 F. Supp. at 199–200.

Nothing in the September 8 letter, or in any other document, states any basis for the United States' demand for a complete copy of Hawaii's statewide voter registration list. Despite the demand's stated purpose, there is no indication in the September 8 letter or elsewhere that Hawaiʻi is out of compliance with the NVRA or HAVA. *Cf. Oregon*, 2026 WL 318402, at *9 ("Plaintiff's August 14 Letter contains no statement of a factual basis for believing Oregon violated the NVRA or HAVA."). Nor is there any explanation for why a complete and unredacted copy of the statewide voter registration list would be necessary to ensure such compliance.[4]

Allowing the United States to obtain records under Title III without stating any basis would "render" a portion of the statute "a dead letter[,]" contrary to how courts should "normally seek to construe Congress's work[.]" *Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nickels*, 150 F.4th 1260, 1271 (9th Cir. 2025) (internal quotation marks omitted). It also cannot be the case, as the United States has argued

---

[4]    In *Benson*, the district court concluded that the basis requirement was met because the United States' demand "pointed to several purported anomalies within Michigan's voter registration data" and "indicated that the DOJ had received a complaint regarding Michigan's compliance with HAVA's requirements relating to the provision of unique voter identifiers." 2026 WL 362789, at *8. Even assuming that is sufficient—which Defendant disputes—the United States' demand to Hawaiʻi mentioned no data anomalies or complaints regarding the State's NVRA or HAVA compliance.

elsewhere, that "'basis' refers to the *legal* basis for the investigation (i.e. the federal statute giving rise to the investigation) rather than a *factual* basis for pursuing that investigation." *Oregon*, 2026 WL 318402, at *8. That interpretation would "collapse[] its meaning with that of 'purpose'" and give the United States "virtually limitless access to records required to be maintained under Title III." *Id.* at *8–9.

For failure to state a basis, the Court should dismiss the Title III claim.

### 2.    The United States' stated purpose was insufficient.

Second, to the extent the demand stated a purpose, it still failed to satisfy the requirements of Title III. Demands under Title III may only be made in support of civil rights investigations, that is, investigations of efforts to prevent eligible voters from voting or registering to vote for illegal reasons like racial discrimination. *See id.* at *9–10. The United States' demand in this case was invalid because it did not relate to such an investigation.

As discussed above, the basis and purpose requirement is mandatory. But it clearly cannot be the case that a statement of "*any* purpose—regardless of its relationship to the purposes of the statute itself—would suffice[.]" *Id.* at *9. Otherwise, the purpose requirement would be "sap[ped] . . . of all practical significance." *Id.* (quoting *Pac. Coast Fed'n of Fishermen's Ass'ns*, 150 F.4th at 1273). "'Purpose' must have some constraints, or its requirement would be meaningless." *Id.*

10

"[U]nderstanding the historical context in which a statute was passed can help to elucidate the statute's purpose and the meaning of statutory terms and phrases." *County of Amador v. U.S. Dep't of the Interior*, 872 F.3d 1012, 1022 (9th Cir. 2017). Civil rights statutes in particular can be illuminated by "the historical context from which [they] arose." *Doe v. Kamehameha Schs./Bernice Pauahi Bishop Est.*, 470 F.3d 827, 847 (9th Cir. 2006) (en banc) (quoting *United Steelworkers of Am. v. Weber*, 443 U.S. 193, 201 (1979)).

When it comes to Title III of the 1960 Civil Rights Act, "a review of its history directs the conclusion that it was intended to protect against the infringement of voting rights." *Oregon*, 2026 WL 318402, at *10. When President Eisenhower suggested the legislation to Congress, he explained that, while the 1957 Civil Rights Act had "authoriz[ed] the Attorney General to institute civil proceedings to prevent . . . infringements [of the right to vote] before they occurred[,]" a lack of "authority to require the production of election records in a civil proceeding" had become "[a] serious obstacle" which had "minimize[d] the effectiveness" of the 1957 Act. Special Message to the Congress on Civil Rights, 1 Pub. Papers 164, 166 (Feb. 5, 1959). New legislation requiring that election records be preserved for federal inspection was, in his view, "essential to determine whether the denial of the franchise was in furtherance of a pattern of racial discrimination." *Id.*

11

Congress shared President Eisenhower's concerns and goals. *See* H.R. Rep. No. 86-956, at 7 (1959) ("The purpose of title III is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race."); *Oregon*, 2026 WL 318402, at *3 ("The Department of Justice has no existing power in civil proceedings to require the production of [voting] records during any investigation it conducts as to complaints that qualified persons have been denied the right to vote in violation of Federal law." (quoting 106 Cong. Rec. 5,208 (1960))). And upon signing the bill, President Eisenhower again referred to "that key constitutional right of every American, the right to vote without discrimination on account of race or color[,]" saying that the provision "which requires the retention of voting records" would "be of invaluable aid in the successful enforcement of existing voting rights statutes." Statement by the President Upon Signing the Civil Rights Act of 1960, 1 Pub. Papers 398, 398 (May 6, 1960).

Courts litigating the earliest Title III cases expressed "no doubt" that the legislation was "designed to secure a more effective protection of the right to vote." *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960); *see Lynd*, 306 F.2d at 228 ("[O]ne of the clearest purposes of the Title III proceeding is to enable the Attorney General to assemble all of the voter record information within the time-reach of the statute relating to all persons as to whom there is a question concerning infringement or denial of their constitutional voting rights.").

Accordingly, demands made by the Attorney General in the years after the enactment of Title III were based on information "tending to show that distinctions on the basis of race or color ha[d] been made with respect to registration and voting," and they identified their purpose as "examin[ing] . . . records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred." *Lynd*, 306 F.2d at 229 n.6; *see Coleman*, 208 F. Supp. at 199–200.

No civil rights purpose was stated in the September 8 letter, and none is alleged in the United States' Complaint. The United States' stated purpose concerns assessing compliance with the NVRA and HAVA. The NVRA requires each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" when those voters die or change residence. 52 U.S.C. § 20507(a)(4). And HAVA requires state and local election officials to "perform list maintenance with respect to the computerized list" consistent with the NVRA. *Id.* § 21083(a)(2)(A). But the mere failure to purge ineligible voters from these lists for these purposes does not automatically fall within Title III's scope. *See Kennedy v. Bruce*, 298 F.2d 860, 863 & n.2 (5th Cir. 1962) (statistics "indicat[ing] that there have been failures to purge voters who have moved away or have died" had no bearing of "any particular importance to the present inquiry").

With no connection to racial discrimination, NVRA and HAVA compliance are not proper subjects of a Title III demand. Obviously, "the passage of Title III in 1960 preceded the NVRA by several decades" and "[u]niform, centralized statewide voter registration lists . . . were not even required until the passage of HAVA in 2002." *Weber*, 2026 WL 118807, at *9. The Congress of 1960 could not have anticipated states' needs to comply with these Acts decades later. And the Congresses of 1993 and 2002 provided their own, much narrower mechanisms for enforcement of the NVRA and HAVA. *See Oregon*, 2026 WL 318402, at *2–3 (discussing each statute's civil enforcement provision). Title III was only meant to provide the Attorney General with access to "public records which ought ordinarily to be open to legitimate reasonable inspection." *Lynd*, 306 F.2d at 231. It was never intended to provide access to "confidential, private papers and effects." *Id.*

Because the United States failed to allege any basis for its demand, let alone one indicating that voters are being denied the right to vote in Hawai'i based on race, and because the demand's alleged purpose has no relationship to discrimination in voting, the Title III claim fails as a matter of law.

### 3. The United States may be misstating its purpose.

Even if ensuring compliance with the NVRA and HAVA is a legitimate purpose under Title III, the Court need not accept the United States' stated purpose at face value. Where "representations made by the DOJ elsewhere paint a starkly

14

different picture[,] . . . this Court cannot ignore" them. *Weber*, 2026 WL 118807, at
*10.

As discussed above, this is one of over 20 cases arising from over 40 demands
for records. The sheer number of demands and lawsuits on its own should raise some
suspicion about whether the United States is truly concerned about any single state's
compliance with the NVRA or HAVA. *See id.* at *4 ("These nationwide efforts point
at a larger pattern than the DOJ's stated purpose[.]"). But even if NVRA and HAVA
compliance could ordinarily underlie a proper Title III demand, the Court "is not
required to accept pretextual, formalistic explanations untethered to the reality of
what the government has said outside of the courtroom." *Id.* at *10.

Both the California and Oregon district courts considered statements by
Justice Department officials "show[ing] that their requests to states for voter roll data
go beyond their purported compliance check with the NVRA and into the territory
of comprehensive data collection" and immigration enforcement. *Id.*; *see Oregon*,
2026 WL 318402, at *11 (discussing the same statements). Perhaps most
concerningly, as related in *Oregon*, Attorney General Pamela Bondi sent a letter to
Minnesota Governor Tim Walz on January 24 in which allowing the Department to
access Minnesota's voter rolls was listed as one of several demands necessary to
"restore the rule of law" amid immigration enforcement actions in that state. 2026
WL 318402, at *11. "The context of this demand within a letter about immigration

enforcement casts serious doubt as to the true purposes for which [the United States] is seeking voter registration lists in this and other cases, and what it intends to do with that data." *Id.*

While the Court need not consider these additional statements to grant Defendant's motion, *id.* at *10 n.5, neither is it required to turn a blind eye to them, *see id.* at *11 ("[C]oncerns about [the United States'] ulterior motives for seeking the sensitive data require attention. The presumption of regularity that has been previously extended to [the United States] . . . no longer holds."); *Weber*, 2026 WL 118807, at *12 ("The Court does not take lightly DOJ's obfuscation of its true motives in the present matter."). When the United States' "open and public statements" contradict its "assurances that any private and sensitive data will remain private and used only for a declared and limited purpose, it must be thoroughly scrutinized." *Oregon*, 2026 WL 318402, at *11.

### 4.    This Court must ensure compliance with Title III.

The United States may argue that "a Title III written demand requires only a superficial statement that its demand for records is made for the purpose of investigating a violation of a federal statute, and that the Court is precluded from evaluating the legal sufficiency of the statement of basis and purpose." *Oregon*, 2026 WL 318402, at *7; *see* Compl. ¶¶ 3–4. The Court should reject the argument that Title III leaves no space for judicial review.

16

In support of this argument, the United States has relied on cases like *Lynd*, *Bruce*, and *Coleman*, where the Fifth Circuit was evaluating Title III demands made in support of investigations of the unconstitutional infringement or denial of the right to vote. *Oregon*, 2026 WL 318402, at \*7–8. In *Lynd*, the Fifth Circuit held that a Title III proceeding is not an "ordinary civil action," but instead a "special statutory proceeding" "comparable to the form of a traditional order to show cause[.]" 306 F.2d at 225. There is, however, "[n]othing in the text of Title III [that] requires a special statutory proceeding or any abbreviated procedures." *Weber*, 2026 WL 118807, at \*8. Rather, Title III provides that "[t]he United States district court for the district in which a demand is made . . . , or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. § 20705.

"The statute does not define what that 'appropriate process' is." *Oregon*, 2026 WL 318402, at \*8. However, two years after *Lynd*, the Supreme Court considered a provision of the Internal Revenue Code that "grants courts the general power to enforce the Commissioner [of Internal Revenue's] summonses 'by appropriate process[.]'" *United States v. Powell*, 379 U.S. 48, 52 (1964) (quoting 26 U.S.C. § 7604(a)). With "no provision specifying the procedure to be followed in invoking the court's jurisdiction," the Supreme Court held that "the Federal Rules of Civil Procedure apply," *id.* at 58 n.18, and it rejected the proposition that "under no

17

circumstances may the court inquire into the underlying reasons for the examination," *id.* at 58.

"The Supreme Court's holding in *Powell* squarely rejects" the contention that "Title III precludes the Court from evaluating the sufficiency of [the United States'] allegations regarding Defendant['s] alleged failure to comply with Title III, including whether . . . a valid Title III demand was made in the first place." *Oregon*, 2026 WL 318402, at *8; *see Weber*, 2026 WL 118807, at *8 ("The Supreme Court has . . . affirmed that the federal government's demands for documents are governed by the Federal Rules of Civil Procedure[.]").[5]

## B.    The relief sought is beyond the bounds of Title III.

Even if the Court concludes that a proper basis and purpose have been stated, or that it lacks the authority to evaluate such a statement, the United States'

---

[5]    The United States filed a notice in which it represented to the Court that the United States District Court for the District of Connecticut "agreed with the United States" with regard to this expedited procedure in a January 8 order. ECF No. 23 at 1–2. However, in a subsequent order which the United States did not bring to the Court's attention, the Connecticut district court indicated that it had not yet decided whether to "accept[] the scope and limitations of the [Civil] Rights Act as set forth in *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962)" and that it would do so after the issue was fully briefed and heard. Order, ECF No. 30, *United States v. Thomas*, No. 3:26-cv-00021-KAD (D. Conn. Jan. 14, 2026); Notice Amending Order, ECF No. 33, *Thomas* (Jan. 15, 2026); *see Weber*, 2026 WL 118807, at *19 (describing the January 8 order as "nothing more than a scheduling order delineating a briefing schedule").

Complaint still must be dismissed because the relief it seeks is not authorized by Title III.

The records Defendant is required to retain and produce under Title III are those "which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting[.]" 52 U.S.C. § 20701. However, Hawaii's statewide voter registration list did not "come into [Defendant's] possession." *Id.* That term "naturally refers to a process by which someone *acquires* an item from an external source" and is frequently used by Congress "to refer to items that a person *obtains* rather than *creates*." *Benson*, 2026 WL 362789, at *9 (collecting statutes). But Defendant did not obtain the list from somewhere else. Rather, his predecessor in office created the list and he continues to update and maintain it in accordance with federal law. *See* 52 U.S.C. § 21083(a)(1)(A). Title III "requir[es] states to preserve records that voters submit to them—not records that states create." *Benson*, 2026 WL 362789, at *9. This "makes sense[,]" as Congress' concern in 1960 was that "the voting rights of Black citizens had been frustrated by state officials' destruction of voter registration applications." *Id.*

Additionally, nothing in Title III requires Defendant to produce an "electronic copy of Hawaii's computerized statewide voter registration list," which is the relief sought in this case. ECF No. 1 at 9. Instead, Title III only requires that, upon proper written demand, records must "be made available for inspection, reproduction, and

19

copying at the principal office of [a] custodian by the Attorney General or [her] representative." 52 U.S.C. § 20703. There is no requirement in this 1960 law that a custodian create an electronic copy of his records, nor that he transmit such a copy to the Department via a file-sharing system, as requested in the written demand. *See* ECF No. 5-2 at 4. If later Congresses familiar with modern computer systems had wanted to require such copying and transmissions, they could have, but they did not.

## C.    State law bars the United States' demand.

The United States' demand also does not overcome procedural and substantive requirements in State law.

Hawaiʻi law provides that "[a] voter's full name, district/precinct designation, and voter status shall be public; but all other personal information, as provided on the voter registration affidavit, shall be confidential except for election or government purposes in accordance with rules adopted by the chief election officer[.]" Haw. Rev. Stat. § 11-97. Those rules, in turn, provide that a request for non-public voter information must be made "in a form prescribed and provided by the chief election officer" and must include certain sworn certifications and, in the case of a government agency seeking sensitive information, "a statement setting forth reasons why such information is required[.]" Haw. Admin. R. § 3-177-160(g).

Nothing in Title III preempts these procedural and substantive protections. Although, under the Elections Clause, congressional regulations of federal elections

"supersede those of the State which are inconsistent therewith[,]" they do so only "so far as [Congress' power] is exercised, and no farther[.]" *Arizona*, 570 U.S. at 9 (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880)). If a state regulation can "operate harmoniously in a single procedural scheme for federal voter registration," then it is not superseded by federal law. *Gonzalez*, 677 F.3d at 394.

Hawaiʻi law can and must be read harmoniously with Title III, which does not prohibit the withholding or redaction of sensitive voter information. *Cf. Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (holding that "the appropriate redaction of uniquely or highly sensitive personal information in the Voter File" was permissible where the NVRA did not prohibit such redactions). Therefore, the United States must comply with Hawaii's regulations, and Defendant cannot be made to release information protected by State law.

### D.    The United States' demand violates federal privacy laws.

The Court may consider affirmative defenses at the motion to dismiss stage "when there is 'some obvious bar to securing relief on the face of the complaint.'" *U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*, 931 F.3d 966, 973 (9th Cir. 2019). Here, it is clear from the face of the Complaint that granting relief to the United States would "violate[] . . . the Privacy Act, E-Government Act, and Driver's Privacy Protection Act[(DPPA).]" *Weber*, 2026 WL 118807, at *17.

21

### 1.    The demand violates the Privacy Act.

The Privacy Act bars the United States' claim. The Act "exists to protect individuals from disclosure of government-collected information." *Ritter v. United States*, 177 Fed. Cl. 84, 87 (2025). To that end, it prohibits federal agencies from collecting or maintaining records related to an individual's First Amendment activities (unless narrow exceptions apply), and requires them to follow specific procedures before they maintain, collect, use, or disseminate any group of records searchable by individual. 5 U.S.C. § 552a(a)(3), (a)(5), (e)(4), (e)(7), (f).

The Privacy Act applies to the detailed voter data requested by the United States. A covered "record" includes "any item, collection, or grouping of information about an individual that is maintained by an agency." *Id.* § 552a(a)(4). The statewide voter registration list includes "[a]ll voter registration information obtained by any local election official in the State[,]" 52 U.S.C. § 21083(a)(1)(A)(vi), which in Hawai'i includes the person's name, date of birth, mailing address, and driver's license number, state identification card number, or the last four digits of the person's social security number, Haw. Rev. Stat. § 11-15(a), (c); *see* ECF No. 1 at 9 (requesting the production of the list with "all fields"). And the United States' effort to obtain Hawaii's records will result in a collection of records covered by the Privacy Act. *See* 5 U.S.C. § 552a(a)(3).

But the Privacy Act prohibits a federal agency from collecting records "describing how any individual exercises rights guaranteed by the First Amendment[.]" *Id.* § 552a(e)(7). Registering to vote and participating in elections are types of political expression protected by the First Amendment. *Weber*, 2026 WL 118807, at *17 (citing *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999)). And none of the statutory exceptions apply. No statute "expressly authorize[s]" the United States to maintain the complete, unredacted records of Hawai'i voters. 5 U.S.C. § 552a(e)(7). Nor have those voters themselves authorized this federal dragnet simply by registering to vote. *See id.* And a point-in-time snapshot of the voter file is not pertinent to nor within the scope of the United States' purported investigation into Hawaii's compliance with the ongoing requirements of the NVRA and HAVA.

Additionally, the Privacy Act requires a federal agency to publish a notice in the Federal Register before "establish[ing] or revis[ing]" a "system of records[,]" *id.* § 552a(e)(4), defined as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual[,]" *id.* § 552a(a)(5). The United States has identified no system of records notice, even after Defendant raised the issue in his response to its original demand. *See* ECF No. 5-2 at 7. This dooms the United States' data-collection efforts under

23

the Privacy Act, as the Act requires public notice and comment about how records will be used before the federal government collects its citizens' data. "If millions of Americans' private information is to be collected by the federal government, they deserve the ability to comment and voice their concerns before this collection occurs." *Weber*, 2026 WL 118807, at *18.

## 2.     The demand violates the E-Government Act.

For similar reasons, the United States' demand also violates the E-Government Act. That Act requires federal agencies to "conduct a privacy impact assessment" "*before*" "initiating a new collection of information" that "will be collected, maintained, or disseminated using information technology" and "includes any information in an identifiable form permitting the physical or online contacting of a specific individual" if the information encompasses "10 or more persons[.]" Pub. L. No. 107-347, § 208(b)(1), 116 Stat. 2899, 2921–22 (2002) (emphasis added). "The information the DOJ seeks to collect from [Hawaiʻi]—like names and addresses of voters—is personal information protected by the E-Government Act[,]" *Weber*, 2026 WL 118807, at *19, yet the United States fails to allege that a privacy impact assessment was conducted.

## 3.     The demand violates the Driver's Privacy Protection Act.

Finally, the DPPA prohibits Defendant from disclosing information from the statewide voter registration list. The DPPA limits the purposes for which "[a]n

24

authorized recipient of personal information"—including an individual's name, address, driver identification number, and social security number—may redisclose the information. 18 U.S.C. §§ 2721(c), 2725(3). Defendant is such an authorized recipient because he receives driver's license information directly from state and county databases, Haw. Rev. Stat. § 11-15.7(c); *see* 52 U.S.C. § 21083(a)(5)(B)(i), and because county DMVs transmit voter registration application information to county clerks, Haw. Rev. Stat. § 11-15.7(a), who in turn are required under HAVA to add the information to the statewide list, 52 U.S.C. § 21083(a)(1)(A)(vi).

The United States alleges that the disclosure demanded here would fall under the DPPA's exception for "use by any government agency . . . carrying out its functions[.]" 18 U.S.C. § 2721(b)(1); Compl. ¶ 24. But the United States does not explain why or how access to thousands of Hawai'i driver's license numbers would be used to "understand whether [Hawai'i] conducts a general program that makes a reasonable effort to remove persons from its voter rolls due to death or change in residence." *Weber*, 2026 WL 118807, at *19. Thus, the DPPA is not satisfied.

## IV.  CONCLUSION

For the foregoing reasons, the Court should grant Defendant's motion to dismiss. And because none of the legal issues could be resolved by amending the Complaint, dismissal should be with prejudice.

DATED:  Honolulu, Hawai‘i, February 18, 2026.


/s/ *Thomas J. Hughes*
KALIKO‘ONĀLANI D. FERNANDES
THOMAS J. HUGHES
ANDREW Z.M. TEOH
AARON H. SCHULANER

Attorneys for Defendant
SCOTT NAGO