HARMEET K. DHILLON
Assistant Attorney General
ROBERT J. KEENAN
Acting Deputy Assistant Attorney General
ERIC V. NEFF
Acting Chief, Voting Section
BRITTANY E. BENNETT
CHRISTOPHER J. GARDNER
Trial Attorneys, Voting Section
  Civil Rights Division
  U.S. Department of Justice
  150 M Street NE
  Washington, D.C.  20002
  Telephone:  (202) 704-5430
  E-Mail:  Brittany.Bennett@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>               Plaintiff,<br><br>      v.<br><br>SCOTT NAGO, in his Official Capacity as Chief Officer of Elections for the State of Hawaii,<br><br>           Defendant. | Case No. 1:25-cv-00522-LEK-RT<br><br>UNITED STATES' CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS FILED BY DEFENDANT NAGO (Doc. 53) AND INTERVENOR-DEFENDANT (Doc. 52)<br><br>DATE:    April 3, 2026<br>TIME:    11:00 a.m.<br>PLACE:  Courtroom 2 |

# **TABLE OF CONTENTS**

I.   INTRODUCTION ..................................................................................................... 1

II.  BACKGROUND ..................................................................................................... 3

III. MOTIONS TO DISMISS ARE INAPPLICABLE TO TITLE III OF THE CRA AND CANNOT
     CHALLENGE THE BASIS AND PURPOSE FOR THE DEMAND ................................................ 6

     A.   The Federal Rules of Civil Procedure are inapplicable to motions to compel under Section 305
          of the CRA. ................................................................................................... 7

     B.   Title III of the CRA does not require allegations that the federal election records demanded are
          needed to investigate race-based denial of voting rights. ........................................... 13

     C.   Movants cannot challenge the Attorney General's basis and purpose to investigate Hawaii's
          HAVA compliance ........................................................................................... 19

     D.   Hawaii's SVRL falls within Section 301's broad definition of "all records and papers" relating
          to registration to vote in federal elections. ........................................................... 23

IV.  THE UNITED STATES IS COMPLYING WITH FEDERAL PRIVACY LAWS ........................ 34

     A.   The United States is complying with the Privacy Act. ............................................... 34

     B.   The First Amendment does not prohibit access to data the United States needs for its HAVA
          claim ............................................................................................................ 36

     C.   The E-Government Act does not prevent the United States from obtaining data supporting its
          HAVA claim. .................................................................................................. 37

     D.   The Driver's Privacy Protection Act does not allow Officer Nago to deny the United States list
          maintenance data ............................................................................................. 39

V.   CONCLUSION ..................................................................................................... 40

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960) ................................... passim

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ............................................. 4

*Becker v. United States*, 451 U.S. 1306 (1981) ...................................................... 12, 13

*Becker v. United States,* 452 U.S. 912 (1981) ............................................................ 12

*Becker v. United States,* 452 U.S. 935 (1981) ............................................................ 12

*Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020) ................................................... 18

*Coal for Open Democracy v. Formella*, 23-1585, 2025 WL 3786144 (1st Cir. July 2, 2025)................ 34

*Coal. for Open Democracy v. Scanlan*,

    No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025)...................................... 33

*Coleman I*, 208 F. Supp. at 200-01 .............................................................. 20, 21

*Coleman II*, 313 F.2d at 868 ...................................................................... 21

*Coleman v. Campbell*, 208 F. Supp. 199 (S.D. Miss. 1962)....................................... 15

*Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) .......................................... 7, 15, 32

*Colón-Marrero v. Vélez*, 813 F.3d 1 (1st Cir. 2016)............................................... 4

*Donaldson v. United States*, 400 U.S. 517 (1971) .............................................. 12

*Ebert v. Poston*, 266 U.S. 548 (1925) ........................................................ 17

*Ex Parte Siebold*, 100 U.S. 371 (1879) ......................................................... 4

*Foster v. Love*, 522 U.S. 67 (1997)........................................................... 3, 4

*In re Gordon*, 218 F. Supp. 826 (S.D. Miss. 1963) ............................................ 9

*Judicial Watch v. Lamone*, 399 F.Supp. 3d 425 (D. Md. 2019) ............................... 25

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962)........................................... passim

*Lynd*, 306 F.2d at 226 ......................................................................... 20

*Pub. Interest Legal Found., Inc. v. Dahlstrom,* 673 F. Supp. 3d 1004 (D. Alaska 2023) ...... 26

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995).......................................... 3

*United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846 (W.D. La. 1960)........... 7, 9

*United States v. Benson*, , No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789, at *8 (W.D. Mich. Feb. 10, 2026) ................................................................................................................... 20

*United States v. Bisceglia*, 420 U.S. 141 (1975) ................................................................. 8

*United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006) ......................... 30, 31

*United States v. Great N. Ry. Co.,* 343 U.S. 562 (1952) ......................................................... 18

*United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269 (1929) ................................................. 17, 18

*United States v. Powell*, 379 U.S. 48 (1964) ......................................................... 8, 9, 10, 11

**Statutes**

5 U.S.C. § 552a ................................................................................................................... 36

52 U.S.C. § 20701 .......................................................................................................... passim

52 U.S.C. § 20703 .......................................................................................................... passim

52 U.S.C. § 20705 ................................................................................................................ 2, 5

52 U.S.C. § 20706 ................................................................................................................... 2

52 U.S.C. § 21083 ......................................................................................................... 4, 6, 22

52 U.S.C. § 21111 ................................................................................................................. 5

The E-Government Act of 2002, Pub. L. No. 107–347, § 208 ....................................... 37, 38

**Other Authorities**

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 32-33 (Aug. 2001) ................................................................................................................. 18

*Webster's New World Dictionary of the American Language* 1140 (8th coll. ed. 1960) ......................... 29

*Webster's Third New International Dictionary* 453 (1966 ed. unabridg.) ................................. 30

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 ..................................................................................................... 3

**Legislative Materials**

106 Cong. Rec. 7767 ............................................................................................................. 17

H.R. Rep. 107-329, pt. 1 (2001) ........................................................................................... 18

Plaintiff United States of America respectfully submits this Memorandum of Law in opposition to the Motions to Dismiss by: (1) Defendant Chief Elections Officer of Hawaii, Scott Nago ("Officer Nago") (Doc. 53) ("Defendant"); and (2) Intervenor-Defendant NAACP California-Hawaii State Conference (Doc. 52) ("Intervenor"). Collectively, Defendant and Intervenor are referred to as the "Movants." The United States submits this consolidated Memorandum, instead of two separate opposition briefs, to facilitate the Court's review of the duplicative and overlapping arguments made by the Movants.[1]

## I.    INTRODUCTION

The Attorney General of the United States brought this case as part of her investigation of Hawaii's list maintenance practices under the Help America Vote Act ("HAVA") and the National Voter Registration Act ("NVRA"). The United States engaged in correspondence with Officer Nago, requesting his cooperation in providing federal election records necessary to its assessment in a manner consistent with federal privacy law. Those efforts were met by Officer Nago's refusal to produce records as mandated by federal law and necessary to evaluate compliance with federal election laws. This action followed. *See* Compl., Doc. 1.

Title III of the Civil Rights Act ("CRA") provides the principal statutory authority for the United States to immediately obtain federal election records including Hawaii's

---

[1] The combined brief complies with the total page limit for two separate opposition briefs to the pending Motions to Dismiss (Docs.52 & 53).  *See* LR 7.1(a)(3).

statewide Voter Registration List ("SVRL"). Those provisions broadly authorize the Attorney General to compel production of "all records and papers" that "come into … possession" of the officers of election relating to registration or other acts requisite to voting in federal elections. 52 U.S.C. § 20701; *see also* 52 U.S.C. § 20705 (authorizing the Attorney General to bring an action to compel the production of federal election records demanded under Section 303 of the CRA). In that manner, Title III is unique because it is purely an investigative tool. As such, it enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).[2]

The CRA restricts the Court to a "severely limited" inquiry as follows: (1) did the Attorney General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration; (3) did the officer(s) of election fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that she satisfied the first three elements. *Lynd*, 306 F.2d at 225-26; *see also* 52 U.S.C. §§ 20703, 20706.

---

[2] Circuit caselaw addressing the CRA in any depth has been confined to courts within the Fifth Circuit in the early years following the CRA's enactment. The United States is unaware of any circuit courts disagreeing with the Fifth Circuit's approach to the CRA. Recently two District Courts in the Ninth Circuit and one District Court in the Sixth Circuit reached a contrary conclusion. However, those decisions are burdened by erroneous applications of the statute. *See infra* at 10-14, 20, 27-32.

As discussed below in detail, the record before the Court demonstrates that the United States has satisfied each of these requirements. In contrast, Movants have wholly failed to establish that there remains any "matter[] open for determination" which would provide a basis for the motions to dismiss. *Lynd*, 306 F.2d at 226. Therefore, the United States' Motion to Compel (Doc. 5) should be granted, the Motions to Dismiss (Doc. 52 and Doc. 53) should be denied, and an order compelling production of Hawaii's SVRL and other responsive federal election records should be entered.

## II.  BACKGROUND

While the United States Constitution invests states with broad powers over the conduct of federal elections, it also explicitly authorizes Congress to override those state choices. The Elections Clause provides, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Supreme Court has explained that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines to preempt state legislative choices …. Thus, it is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832-33 (1995)) (citations omitted). "[T]he regulations made

by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex Parte Siebold*, 100 U.S. 371, 384 (1879)); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-9 & n.1 (2013) (discussing the breadth of the Elections Clause).

Congress enacted broad regulations over the conduct of federal elections in the two statutes at issue in this litigation. Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. HAVA requires states to implement a computerized SVRL and establish "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.*[3]  Only the United States, through the Attorney General, is authorized to compel records

---

[3] "HAVA's look-back to NVRA in section 303(a)(4)(A) is sensibly understood only as an assurance that the obligations and procedures required by that HAVA subsection—i.e., a system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters, but protects eligible voters—align with those previously mandated by NVRA." *Colón-Marrero v. Vélez*, 813 F.3d 1, 13-14 (1st Cir. 2016).

under Title III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA).

Acting pursuant to the United States' authority to enforce these federal election statutes, on September 8, 2025, the Department of Justice sent Officer Nago, Hawaii's chief elections officer, a letter requesting, *inter alia*, a copy of Hawaii's SVRL. Sept. 8, 2025 Ltr., Doc. 5-2.  As stated in the September 8 Letter, the basis for the demand was Title III of the Civil Rights Act of 1960 (CRA) codified at 52 U.S.C. §20701, *et seq*. and the purpose was to "ascertain Hawaii's compliance with the list maintenance requirements of the NVRA and HAVA." Doc. 5-2 at 3. The letter informed Officer Nago that the list is subject to federal privacy protections, including Section 304 of the CRA and the Privacy Act. *Id.*

On September 22, 2025, Officer Nago rejected the Attorney General's written demand. Doc. 5-2 at 6. On December 1, 2025, the United States followed up by email to Officer Nago requesting Hawaii's SVRL (December 1 Email). Doc. 5-2 at 10. Officer Nago refused to provide Hawaii's SVRL. (December 2 Email). Doc. 5-2 at 12. On December 11, 2025, the Attorney General then instituted these summary proceedings to compel production. *See* Compl., Doc. 1.

As explained in the attached second declaration of Eric Neff, the United States seeks these documents for the limited purpose of evaluating Hawaii's compliance with the list maintenance provisions of HAVA and the NVRA, and if appropriate, to bring an

enforcement action. *See* Second Declaration of Eric Neff ("2d Neff Decl.") ¶ 2.  HAVA requires that "an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes" the applicant's driver's license number or if that is unavailable, the last four digits of the Social Security number ("SSN4"). 52 U.S.C. § 21083(a)(5)(A)(i). That information is necessary to identify duplicate registration records, registrants who have moved, registrants who have died, and those who are not eligible to vote in federal elections. 2d Neff Decl. ¶¶ 3-4.

### III.  MOTIONS TO DISMISS ARE INAPPLICABLE TO TITLE III OF THE CRA AND CANNOT CHALLENGE THE BASIS AND PURPOSE FOR THE DEMAND

Movants misapprehend the nature of a CRA claim by erroneously suggesting the Court should apply the Federal Rules of Civil Procedure to the demand for records under the CRA. They incorrectly maintain that Title III of the CRA applies to only discrimination claims. They ask the Court to ignore caselaw under the CRA and allow an impermissible challenge to the basis and purpose of the Attorney General's written demand. Likewise, they assert that the Court should undermine the Attorney General's enforcement authority by rewriting the congressional mandate in the CRA. In place of producing all election records requisite to voting in federal elections, Movants invite the Court to narrow the mandate to encompass only publicly available records. For the reasons discussed below, Movants' Motions to Dismiss (Docs. 52 & 53) should be denied, the United States' Motion

to Compel (Doc. 5) granted, and Officer Nago compelled to produce the demanded federal election records including Hawaii's SVRL.

**A.    The Federal Rules of Civil Procedure are inapplicable to motions to compel under Section 305 of the CRA.**

Movants argue that the Federal Rules of Civil Procedure govern these proceedings. *See* Def. Mot., Doc. 53-1, at 6-7, 17-18; Intervenor's Mot., Doc. 52-1 at 6-7. They repeat what the Fifth Circuit has described as "a basic misconception … concerning a Title III proceeding." *Lynd*, 306 F.2d at 230.

The "chief purpose" of Title III "is to facilitate the investigation of the records *before suit is filed*." *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is … purely investigative," *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), to evaluate "possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). It does not require known violations of federal law. In that manner, Title III enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Lynd*, 306 F.2d at 228. Contrary to what the Movants argue, no factual allegations of a substantive violation of federal law are required. Instead, "Congress has specifically committed the investigative responsibility to the Attorney General and has equipped [her] with machinery thought suitable for the

7

effective fulfillment of that obligation" through Title III of the CRA.[4] *Id.* at 230. That approach makes sense. The United States cannot be expected to effectively enforce federal election laws like HAVA if the Attorney General is required to allege facts from federal election records that state officers of election have denied to her. *See id.* at 227 (the Attorney General's "right to records does not require that [she] show [she] could win without them").

The Attorney General's filing of an application for an order under Title III "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Id.* at 225. It is "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Id.* In structuring the statute in this way, Congress has indicated that the Federal Rules of Civil Procedure are inapplicable. "Since it is a special statutory proceeding, it does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225-26; *see also Gallion*, 187 F. Supp. at 854 (comparing CRA applications to compel to actions by the Securities and Exchange Commission in which procedural rules "are made specifically inapplicable to investigations"). The CRA differs from ordinary civil actions because its "chief purpose" is to facilitate *pre-suit* investigation. *See Citizens Councils*, 187

---

[4] Title III invests the Attorney General with a power akin to a grand jury which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Bisceglia*, 420 U.S. 141, 148 (1975). The Supreme Court has recognized that statutes that vested investigative powers in Executive Branch agencies provide such agencies with grand jury-like powers and latitude. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that the IRS Commissioner has grand jury-like powers); *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (same with respect to the Federal Trade Commission). The investigative powers that the Attorney General derives from Title III fall comfortably within this paradigm.

F. Supp. at 847. In stark contrast, "[t]he chief purpose of Rule 34 … is to give a party litigant the right to have records produced *after* suit has been filed." *Id.* (emphasis added). To summarize, "[t]here is no place for any other procedural device or maneuver," including the motions to dismiss presently before the Court, in response to a CRA claim. *Lynd*, 306 F.2d at 226; *see also* Fed. R. Civ. P. 81 (summarizing other federal claims to which the Federal Rules of Civil Procedure do not apply).

A recent decision issued by a District Court in the Sixth Circuit agreed with *Lynd* and rejected the arguments raised by Movants. *See United States v. Benson,* No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789, at *7 (W.D. Mich. Feb. 10, 2026) appeal filed, (6th Cir. Feb. 25, 2026) (No. 26-1225) (notice of appeal attached to 2d Neff Decl. as Ex. 12). Instead, the *Benson* court construed "a request for records under the CRA as a form of administrative subpoena." *Id.* (citing *Lynd*, 306 F.2d at 225 and *In re Gordon*, 218 F. Supp. 826, 826-27 (S.D. Miss. 1963)). Therefore, "[m]ost of the Federal Rules of Civil Procedure are simply inapplicable…" *Benson*, 2026 WL 362789, at *7 (quoting *United States v. Markwood*, 48 F.3d 969, 982 (6th Cir. 1995)). The court acknowledged that "'a district court's role in the enforcement of an administrative subpoena is a limited one.'" *Id.*

Two District Courts in the Ninth Circuit reached a different conclusion but erred in doing so. Both courts misread the Supreme Court's decision in *United States v. Powell*, 379 U.S. 48 (1964), to reject the Fifth Circuit's holding in *Lynd* that Title III of the CRA

is a special statutory proceeding where the Federal Rules of Civil Procedure do not apply.[5] *Powell* applied the Federal Rules of Civil Procedure to an IRS administrative summons. There, the Supreme Court made the unremarkable observation that because section 7604(b) of the Internal Revenue Code ("IRC") "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." 379 U.S. at 58 n.18. However, the *Oregon* court applied a much broader construction of *Powell* than the Supreme Court intended.

The *Oregon* court found that *Powell* involved interpretation of "a similar statute" to Title III of the CRA, and the decision's admonition that "the court may 'inquire into the underlying reasons for the examination [of records]'" therefore applied to the CRA. *Oregon*, 2026 WL 318402, at *8 (quoting *Powell*, 379 U.S. at 58). Although the quoted language from *Powell* is correct, *see id.*, the *Oregon* court omitted any explanation that the quoted language referred to a process expressly provided in the IRC that is missing from the CRA. The Supreme Court explained that judicial inquiry was appropriate where asked to enforce an administrative summons under the IRC to determine "if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on

---

[5] *See United States v. Oregon*, Case No. 6:25-cv-01666-MTK, 2026 WL 318402, at **7-8 (D. Or. Feb. 5, 2026), appeal filed, (9th Cir. Feb. 25, 2026) (26-1231)(Notice of Appeal attached to 2d Neff Decl. as Ex. 13); *United States v. Weber*, Case No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807, at *8 (C.D. Cal. Jan. 15, 2026) appeal filed (9th Cir. Feb. 25, 2026) (26-1232)(Notice of Appeal attached to 2d Neff Decl. as Ex. 14).  Movants cite extensively to *Weber* in their motions. *See* Def.'s Mot., Doc. 53-1; Intervenors' Mot., Doc. 52. As discussed below, *Benson* addressed many of the legal errors in *Weber* that call into question whether *Weber* merits any consideration.

him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Id.* That inquiry was permitted because it was specifically authorized by section 7605(b) of the IRC, which prohibited the Government from subjecting a taxpayer "to unnecessary examination or investigations." *Id.* at 52-53 (quoting 26 U.S.C. § 7605(b)). However, no similar language limits the Attorney General's authority to compel records under the CRA. *See* 52 U.S.C. §§ 20701-20706. Nor does the CRA provide any process for officers of election to object to Title III proceedings being initiated against them. *See id.*

Moreover, even with language in the IRC limiting records to "necessary" investigations, the Supreme Court noted that strong deference is given to the Government to investigate, and "'does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, *or even because it wants assurance that it is not.*'" *Powell*, 379 U.S. at 57 (quoting *Morton Salt*, 338 U.S. at 642-43) (emphasis added). *Powell* is completely consistent with *Lynd* and in no way restricts records demands under the CRA to the statutory limitations that Congress included in the IRC.[6]

---

[6] The *Oregon* decision similarly misreads *Lynd* by reasoning "the Court doubts its applicability here where Plaintiff made an affirmative choice to file a complaint and proceed through ordinary litigation" instead of applying "directly to the court for the records." *Oregon*, 2026 WL 318402, at *8 n.1. *Lynd* does not say filing a pleading waives the expedited process under the CRA. Instead, as discussed above, the Fifth Circuit explained only that any pleadings that are filed do not need to "satisfy usual notions under the Federal Rules of Civil Procedure." *Lynd*, 306 F.2d at 225-26.

In addition to *Powell*, the *Weber* court also referred to what it indicated was a decision of the United States Supreme Court. *See Weber*, 2026 WL 118807, at *8 (citing "*Becker v. United States*, 451 U.S. 1306 (1981)"). That is incorrect. *Becker* was an order issued by the Circuit Justice on an application for a temporary stay. *See* 451 U.S. 1306 (1981) (Rehnquist, J., in chambers) (continuing temporary stay pending review by the Court). The subsequent history indicates that the stay was continued, 452 U.S. 912 (1981), and later vacated and denied, 452 U.S. 935 (1981), leaving it without any precedential authority.

Moreover, in *Becker*, which involved an administrative summons under the IRC, then-Justice Rehnquist specifically recognized that *Powell*'s reference to the Federal Rules of Civil Procedure applying to records demanded under the IRC was "'not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and adversary hearing, if requested, is made available.'" *Becker*, 451 U.S. at 1308 (Rehnquist, J., in chambers) (quoting *Donaldson v. United States*, 400 U.S. 517, 528-29 (1971)). Justice Rehnquist distinguished between agency efforts to "to take what is potentially income-producing property" from efforts to "merely require [the respondent] to produce evidence." *Id.* at 1308. Although "the need for summary enforcement of IRS summonses is clear and justifies dispensing with Federal Rules" in the latter context (gathering evidence), "the need to proceed summarily is less clear, as is the justification for dispensing with otherwise applicable provisions of the Federal Rules" in the former

context (seizing income-producing property). *Id.*; *see id.* at 1310-11. When it comes to requests for evidence, "[o]bviously the taxpayer cannot simply write his own ticket as to the manner in which relevant nonprivileged evidence shall be made available to the IRS." *Id.* at 1311. In other words, far from supporting Movants' argument that the summary proceeding does not apply to production of federal records under the CRA, Justice Rehnquist's opinion in *Becker* undercuts it.

Accordingly, the "usual notions under the Federal Rules of Civil Procedure" do not apply to the CRA's "special statutory proceeding" to compel production of federal election records. *Lynd*, 306 F.2d at 225-26; *see also Gallion*, 187 F. Supp. at 852 (same).

**B.     Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights.**

Title III of the Civil Rights Act of 1960 is entitled "Federal Election Records." CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960). This "sweeping" obligation requires officers of election to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. Section 301 provides, in pertinent part, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…." 52 U.S.C. § 20701. Section 303 authorizes the Attorney General of the United States to compel any person "having custody, possession, or control of such record or

paper" to make "available for inspection, reproduction, and copying … by the Attorney General or [her] representative." 52 U.S.C. § 20703.

Notwithstanding the CRA's plain language, Movants argue that the only permissible purpose for a Title III request is if it is related "racial discrimination" targeted by the Civil Rights Act. Def.'s Mot., Doc. 53-1 at 10-14. Intervenors similarly contend that the CRA is limited to discrimination based on race despite the absence of any language in Title III supporting their position. *See* Intervenors' Mot., Doc. 52 at 13. Congress made clear in the CRA where it intended a remedy to be limited to racial discrimination. *See* Section 601 of the CRA, P.L. No. 86-449, 74 Stat. 90 (applying Title VI of the CRA to violations of rights "on account of race or color") (codified as amended at 52 U.S.C. § 10101). That is consistent with express limitations Congress made to remedies in other civil rights statutes. *See*, *e.g.*, 42 U.S.C. § 2000e-2 (prohibiting employment practices "because of such individual's race, color…" in Title VII of the CRA of 1964); 52 U.S.C. §§ 10301-10306, 10309 (prohibiting discrimination "on account of race, color," or language minority status in the Voting Rights Act of 1965); 42 U.S.C. §§ 3604-3606, 3617 (prohibiting discrimination in housing or rentals "because of "race, color, … or national origin" in the Fair Housing Act of 1968). No such language limiting Title III of the CRA to voting rights violations based upon racial discrimination appears anywhere in the statutory text. *See* 52 U.S.C. §§ 20701-20706.

Moreover, in *Gallion,* a case cited by Intervenors, *see* Intervenor's Mot., Doc. 52 at 12, the court concluded "that the prescribed standard of Section 301 is *clear and unambiguous*." *Gallion*, 187 F. Supp. at 848 (emphasis added). Specifically, Title III functions as "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd*, 306 F.2d at 225. The only language that is required in the Attorney General's demand is that it "was made for the purpose of investigating possible violations of a Federal statute." *Coleman II*, 313 F.2d at 868 (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767); *see also Coleman v. Campbell*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) ("*Coleman I*") (a sufficient purpose to examine federal election records is "to see if any Federal laws were violated").

Movants suggest that enforcing list maintenance by examining compliance with HAVA's identification requirements is incompatible with securing an individual's right to vote. *See* Intervenor's Mot., Doc. 52 at 13 (arguing that "Prior enforcement of Title III further confirms that it is meant to be used only for investigating the denial of voting rights") (citation omitted). They are mistaken. In 2001, the bipartisan National Commission on Federal Election Reform, with former Presidents Gerald R. Ford (Rep.) and Jimmy Carter (Dem.) serving as Honorary Co-Chairs, explained why adding driver's license information and the last four of the Social Security numbers for federal elections protected individual voters:

> Any state adopting a statewide voter registration system will confront the problem of uniquely identifying voters,

> figuring which Joseph Smith is the same as that Joe Smith. That is why, following the Michigan example, we recommend obtaining residential addresses, with the DMV and voter registration address required in identical form. An added identifier is desirable, given the various spellings and the clerical errors that frustrate reliance only on a given name and address. For this purpose some numeric identifier can be useful. Given the danger from overuse of entire Social Security Numbers as an individual identifier we suggest that states obtain the last 4 digits of this number as an added identifier. The Federal Election Commission has made the same recommendation.

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 32-33 (Aug. 2001) (excerpts provided as 2d Neff Decl., Ex. 11). Furthermore, the Commission noted that it was "estimated that 92% of all registered voters also have a driver's license," *id.* at 30, which strongly supported use of a driver's license number as a unique identifier for each voter who possessed one. The Commission recognized that "accuracy" of a statewide voter registration database "can mean access." *Id.* It explained, "[u]sed cumulatively, this information could improve the accurate exchange of information affecting voter eligibility and help avoid mistaken voter removals like those that occurred in Florida." *Id.* at 33. Congress heeded the Commission's finding that inaccurate voter databases can disenfranchise individual voters when it enacted HAVA in 2002. It explained how list maintenance and compliance with HAVA's identifying numbers helps protect an individual's right to vote: to "reduce the incidence of voters appearing at a polling place

only to discover that no record of their registration can be found."[7] H.R. Rep. 107-329, pt. 1, at 36 (2001).

Engrafting a requirement of racial discrimination that does not exist in Title III of the CRA would violate the statute's express congressional mandate, while also undermining the Attorney General's enforcement of requirements in HAVA that help protect voting rights. Where, like here, the language of an enactment is unambiguous, "the words employed are to be taken as the final expression of the meaning intended." *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929). Well-established principles of statutory construction foreclose federal courts from rewriting a statute in a manner that better suits a litigant. As the Supreme Court explained, "[t]he judicial function to be exercised in construing a statute is limited to ascertaining the intention of the Legislature therein expressed. A *casus omissus* does not justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554-55 (1925). "[W]here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And

---

[7] Recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny. 2d Neff Decl. ¶¶ 12-14. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *United States v. N. Carolina Bd. of Elections*, Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025) (attached as 2d Neff Decl., Ex. 9). As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See N. Carolina Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026) (attached as 2d Neff Decl., Ex.10).

in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed." *Mo. Pac.*, 278 U.S. at 278 (citations omitted). In that manner, the "judicial function [is] to apply statutes on the basis of what Congress has written, not what Congress might have written." *United States v. Great N. Ry. Co.,* 343 U.S. 562, 575 (1952). "After all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process…." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020).

The *Benson* court rejected arguments that parallel those of the Movants in this case, concluding that the CRA cannot be rewritten to restrict the statute's scope. The court first rejected *Weber*'s imposition of a temporal limitation on the CRA to only those statutes in effect when the Act became law. The court explained, "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes." *Benson*, 2026 WL 362789, at *8. Next, *Benson* rejected the argument that Title III of the CRA only could be used to investigate racial discrimination and observed that "the CRA's text includes no such limitation…" *Id.* Investigating list maintenance efforts under the NVRA fit neatly within the scope of Title III: "The CRA aides the Attorney General in assessing states' compliance with federal

election law and protecting voting rights; the NVRA is a federal election law that protects voting rights." *Id.*

As a result, the United States respectfully submits that the Court must decline Movants' invitation to rewrite the CRA to add a requirement of racial discrimination that simply does not exist in Title III. *See id.*

### C.    Movants cannot challenge the Attorney General's basis and purpose to investigate Hawaii's HAVA compliance.

The CRA establishes a straightforward requirement for the Attorney General to make a written demand to officers of election for federal election records that articulates "the basis and purpose therefor." 52 U.S.C. § 20703. The United States has done that.  In the September 8 Letter, the Attorney General made a written demand under Section 303 of the CRA for Hawaii's federal election records, including its SVRL. Sept. 8, 2025 Ltr., Doc. 5-2. The CRA provided the basis for making the request, and the letter explained that the purpose of the request "is to ascertain Hawaii's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* at 2.

Nevertheless, Movants argue that the United States failed to provide a sufficient statement of the basis and purpose of its request for federal election records. Defendant claims that the Attorney General failed to state a basis for her demand of election records. Def. Mot., Doc. 53-1 at 7-10. Defendant further argues that the September 8 Letter "included no basis and an improper, if not outright contrived, purpose" *Id.* at 2. Intervenors make related arguments. *See* Intervenors' Mot., Doc. 52 at 14. As a threshold matter, the

CRA does not allow these criticisms to derail the United States' demand for election records.

Movants cannot use any "procedural device or maneuver," including the Movants' motions to dismiss, to challenge or "ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Lynd*, 306 F.2d at 226. No discovery or other tools ordinarily available under the Federal Rules of Civil Procedure may be used to question or examine "the reasons why the Attorney General considers the records essential…" *Id.* "Questions of relevancy or good cause or other like considerations" that may be assessed under other statutes to which the Federal Rules of Civil Procedure are applicable "are completely foreign to the summary proceeding" under Section 304 of the CRA. *Id.* at 228; *see also Benson*, , No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789, at *8 (W.D. Mich. Feb. 10, 2026) ("[T]he CRA does not allow courts to evaluate the substance of the DOJ's purported basis and purpose."). Congress vested the Attorney General with broad authority to obtain federal election records under Title III of the CRA. *See Coleman I*, 208 F. Supp. at 200-01. In sum, "the factual foundation for, or the sufficiency of, the Attorney General's" written demand under Section 303 "is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226; *cf. Powell*, 379 U.S. at 56 (explaining that there is no judicial oversight "to oversee the [IRS] Commissioner's determinations to investigate"). Movants' motions

to dismiss the CRA claim for not meeting an elevated showing of statement of "the basis and the purpose" fail under the plain language of the statute, as applied by federal courts.

Movants' contention that the demand needs to include a factual basis showing an *extant* violation of federal law, fails for the reasons discussed above. *See supra at* Part III(A) (describing why the investigative nature of a demand under Title III forecloses any requirement that a specific allegation of a violation of federal law be included in that demand). Instead, a reference to the statutory basis for making the demand, namely the CRA, suffices.

Section 303's requirement that the written demand "contain a statement of the basis and the purpose therefor," 52 U.S.C. § 20703, "means only that the Attorney General [must] identify in a general way the reasons for [her] demand." *Coleman II*, 313 F.2d at 868 (citation omitted). "Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating *possible violations* of a Federal statute." *Id.* (emphasis added); *see also Coleman I*, 208 F. Supp. at 200 (the written demand need only indicate the records were needed "to see if any federal laws were violated"); *cf. Morton Salt*, 338 U.S. at 642-43 (same construction of administrative subpoena by the FTC).

Even if the court allows the type of inquiry Movants seek—and it should not—the United States can demonstrate its factual basis. HAVA requires that voter registration applicants provide a driver's license and SSN4 if they have one. *See* 52 U.S.C. §

21083(a)(5)(A)(i).  The United States needs to verify that states are collecting these numbers by looking at an unredacted voter list. *See* 2d Neff Decl. ¶ 3-4.  The Attorney General made this demand in her September 8 Letter, in which she wrote:

> [T]he electronic copy of the statewide Voter Registration List ("VRL") must contain *all fields*, including the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA")[1] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

September 8 Letter (Doc. 5-2) (emphasis in original). The accompanying footnote explained that when Congress charged the Attorney General with HAVA enforcement, it "plainly intended that DOJ be able to conduct an independent review of each state's list…." *Id.* at n.1. These numbers are also necessary to fulfill the purpose of assessing whether a state is complying with list maintenance requirements because the HAVA identifiers are used to identify duplicate registration records, registrants who have moved, registrants who have died, and those who are not eligible to vote in federal elections. 2d Neff Decl. ¶¶ 3-4.

Contrary to what Defendant says, the United States is not "misstating its purpose," Def. Mot., Doc. 53-1 at 14-16, nor is it creating "a nationwide voter registration list." Intervenors' Mot., Doc. 52-1 at 1. Rather, the records the United States is seeking to compel under the CRA are intended only to perform an individualized assessment of Hawaii's efforts to comply with HAVA and the NVRA.[8] 2d Neff Decl. ¶ 5. The fact that the United

---

[8] As the Second Neff declaration states, the purpose for obtaining voter rolls is limited to assess

States is assessing whether other states are also complying with the list maintenance provisions is not relevant to the election records the United States seeks from Hawaii.[9] The extent of the litigation necessary to obtain those records, in this case and in others, reflects a coordinated effort to impede federal enforcement of those statutes in every state.

### D. Hawaii's SVRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in federal elections.

The scope of federal election records covered by Title III of the CRA is broadly established by Congress. Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period of twenty-two months" from the date of any federal election. 52 U.S.C. § 20701 (emphasis added). This language is unequivocal in its breadth.

Indeed, federal courts that have applied Section 301 have concluded that Congress meant what it said in the statute. It does not exclude production of electronic or non-public records, as Movants argue. *See* Def.'s Mot., Doc. 53-1 at 19-20. One court explained in

_____

compliance with HAVA and the NVRA. 2d Neff Decl. ¶ 2. To the extent that this Court is concerned that the United States might use the election records for immigration enforcement or purposes other than determining compliance with HAVA or the NVRA, this Court can craft an order prohibiting such use when ordering Hawaii to comply with the CRA demand.

[9] When the Civil Rights Division performs this individualized assessment, the State's SVRL is compartmentalized and maintained by the Civil Rights Division separately from the SVRL of any other state. The maintenance, use, and destruction of those records is in full compliance with the requirements in the CRA, Privacy Act, and all other federal laws governing the records. Neff Decl. ¶ 6.

detail why a similar effort to impede the Attorney General's enforcement of federal election laws failed:

> There is nothing uncertain about that part of the Act requiring preservation and production of all records and papers which are in the possession of an election official … if those records and papers relate to the acts requisite to voting…. Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved for a period of twenty-two months 'from the date of any general, special, or primary election …' if they relate to acts requisite to voting in such election.

*Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701). In *Lynd*, the Fifth Circuit likewise recognized that "the papers and records" covered by Section 301 "have been specifically identified by Congress." 306 F.2d at 226. It applies to "all records and papers," as the statute provides, *id.*, and cannot be circumvented in the manner that the Movants suggest.

Federal courts have concluded that Section 303 requires reproduction and copying. For example, in *Lynd*, the court rejected a "mechanical objection[]" in which copying federal election records "would, at one time, have been a formidable thing." *Lynd*, 306 F.2d at 231. There, the court observed that "[m]odern photostating equipment will make short order of most of these demands…." *Id.* Hawaii's SVRL is required by HAVA to be in electronic form. It is axiomatic that providing the United States with an electronic copy of its SVRL will be much less burdensome than physical copying of every individual registration record if complete physical records even exist outside of their electronic form.

24

The Movants also assert that Title III "requir[es] states to preserve records that voters submit to them—not records that states create." (quoting *Benson*). The *Benson* court held that Section 301 applies "only to documents that people *submit* to the State as part of the voter registration process, not a document like the voter registration list that is *created* by state officials." *Benson*, 2026 WL 362789, at *9 (emphasis added). The United States respectfully disagrees; no other federal court has adopted such a limitation. Moreover, today many – and likely even most – voter registration applications are only in electronic form in an SVRL.[10] Such a reading would effectively carve out vast numbers of federal election records, which was plainly not the intention of Congress in passing such "sweeping" legislation. *Lynd*, 306 F.2d at 226. Even the *Benson* court expressed some discomfort at its conclusion, acknowledging that it was possible that "the distinction between voter registration applications and voter registration lists is overly pedantic." 2026 WL 362789, at *10. Nevertheless, *Benson* attributed any failing in that respect to "a pedantic distinction *made by Congress*. *Id.* (emphasis in original).

Federal courts have rejected similar attempts to limit the scope of voting records under other statutes. In *Judicial Watch v. Lamone*, the defendants argued that a "voter list

---

[10] According to the limited data that Hawaii reported to the U.S. Election Assistance Commission, it is doubtful that hundreds of thousands of federal voter registration records exist in any medium other than electronic form. A large percentage of voter registration transactions were reported as being through e-mail, online, and in-person, and through computer entries at designated voter registration locations. *See* U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2024 Comprehensive Report at 162, 164 (June 2024pu), *available at* https://www.eac.gov/research-and-data/studies-and-reports (last visited Mar. 5, 2026).

is not a 'record' under Section 8(i)" of the NVRA, and even if it was, Maryland law allowed election officials to "limit the production of voting-related records more strictly than the NVRA." 399 F. Supp. 3d 425, 434 (D. Md. 2019). The court rejected that contention. It explained that Maryland misunderstood the requirements of the NVRA and the plaintiff was entitled to the registered voter list because "a voter list is simply a pared down compilation of voter registrations" encompassed by the Act. *Id*. at 439-40. The court also was persuaded that the "focus on the information sought" was significant "rather than the particular language used to characterize that information." *Id*. at 440 (citing *Project Vote v. Kemp*, 208 F.Supp.3d 1320, 1329 (N.D. Ga. 2016) (court rejected defendant's argument that plaintiff could not obtain voter list)); *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 337 (4th Cir. 2012) (finding "all records" under Section 8(i)(1) included voter registration records); *see also Pub. Interest Legal Found., Inc. v. Dahlstrom,* 673 F. Supp. 3d 1004,1014 (D. Alaska 2023) (finding "all records" includes ERIC data concerning deceased and potentially deceased voters).

Moreover, there is no reason to attribute such a "pedantic distinction" to Congress. *Benson*, 2026 WL 362789, at *10. The Attorney General is entitled, after an appropriate written demand, to "all records and papers which come into [the] possession" of an "officer of election" and "relat[e] to any application, registration, payment of poll tax, or other act requisite to voting in [certain specified] election[s]" for a period of 22 months from the date of election. 52 U.S.C. §§ 20701, 20703. According to the *Benson* court, "'*come* into

[their] possession' naturally refers to a process by which someone *acquires* an item from an external source" as opposed to the phrase "records in the possession of," which would include documents or records that were self-generated. 2026 WL 362789, at *9 (first emphasis added). That, however, is not what the plain terms of the statute dictate:  an officer "come[s] into … possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 1140 (8th coll. ed. 1960) (defining "possess" and "possession"). Officer Nago acquired the relevant records in the course of carrying out his duties as an officer of election.

The *Benson* court's focus on the word "come" cannot create a carve-out for self-generated documents. Congress used the phrase "*come* into his possession" rather than "*are* in his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and *when* the officer gains possession of the records or documents in the first instance. *See Webster's Third New International Dictionary* 453 (1966 ed. unabridg.) ("to enter upon or into possession of:  acquire esp. as an inheritance"). Numerous statutes use similar phrases to regulate acquiring information or property *through improper means* or trigger duties to act based on acquiring information or property *at a particular time*. *See, e.g.*, 44 U.S.C. § 3572(f) ("comes into possession of such information by reason of his or her being an officer"); 13 U.S.C. § 214 (similar); 30 U.S.C. § 1732(b) ("as soon as practicable after it comes into the possession of the Secretary"; "30

days after such information comes into the possession of the Secretary"); 10 U.S.C. § 130c(d)(2)(C) (prescribing disclosure timing rules for sensitive information that "came into possession or under the control of the United States more than 10 years before the date on which the request is received"). Following this focus on the *when* and *how* an individual gains possession of a record or paper, 52 U.S.C. § 20701 places a duty of retention and preservation only on those officers who acquire a record or paper in the course of administering one of the elections mentioned in that provision—and then only "for a period of twenty-two months from the date" of that same election.

Contrary to the *Benson* court, then, "distinction[s] between possessing something and having something come into one's possession," 2026 WL 362789, at *9, are temporal distinctions—not distinctions between obtaining records from an outside source and through self-generation—as shown by the very example that court cites. Section 1454(a) of Title 8 imposes dual obligations: If a certificate of naturalization is declaration of intention is lost, "the applicant or any other person who shall have" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who … may come into possession of it" at a later time must likewise surrender the document. Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make little sense because no applicant or private person can create a

certificate of naturalization nor can any "other person" create a declaration of intention for a separate declarant.  *See* 8 U.S.C. §§ 1445(f), 1449.

In any event, even if the *Benson* court's distinction between self-generated records and papers and those acquired from another source had merit, it would be irrelevant in all but the most marginal cases. Sections 20701 and 20703 focus on individual "officer[s] of election" and "person[s] having custody, possession, or control of such record[s] or paper[s]." So even if someone in the Secretary of State's office generated the requested record and, under the *Benson* court's view, therefore did not "come into … possession" thereof, any other "officer of election" within the same agency that acquires the record has indeed "come into … possession" of the record under that court's view and was obligated to "retain and preserve" it.  52 U.S.C. § 20701.  And Officer Nago, now "having custody, possession, or control of such record or paper" must "ma[k]e [it] available for inspection, reproduction, and copying." *Id.* § 20703.

Finally, Movants' construction would create absurd results. Title III was enacted to, *inter alia*, counteract discriminatory practices in allowing citizens to vote. *Lynd*, 306 F.2d at 228. (This is not to say that this is Title III's sole purpose. It is not.) The United States previously has pursued successful matters, including in litigation, to obtain statewide voter registration lists under Title III of the CRA. For example, in two of those matters against Georgia and Texas, the United States obtained the SVRLs, including drivers' license numbers and SSN4s, to evaluate compliance with the NVRA, including that Act's list

maintenance requirements.[11] To ascertain whether a jurisdiction engages in practices that violate federal law (whether HAVA, the NVRA, the Voting Rights Act or any other one), the Attorney General needs to examine both applications to register to vote *and* the final voting rolls, including the electronic SVRL, so as to assure herself that the applications are being properly processed and that reasonable list maintenance efforts have been practiced. *See* 2d Neff Decl. ¶¶ 3-5, 7-14. Limiting the Attorney General's ability to anything other than *all records* would make it nearly impossible for her to carry out the duties assigned to her by Congress.

### E.  The United States is entitled to Hawaii's unredacted federal election records, including its SVRL.

Section 303's language provides that "[a]ny record or paper required by [Section 301] to be retained and preserved shall" upon written demand by the Attorney General or her representative stating the basis and purpose, "be made available for inspection, reproduction, and copying…." 52 U.S.C. § 20703. "The incorporated standard of [Section 301] is sweeping." *Lynd*, 306 F.2d at 226. The question is only "open for determination" by the Court if "a genuine dispute … arises as to whether or not any specified particular

---

[11] *See* Compl., *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), Doc. 1. The Court entered a consent decree in the Georgia case requiring production of the SVRL. *See Georgia*, *supra*, at Doc. 4 (filed Oct. 27, 2006). The Texas matter was resolved by a Memorandum of Understanding. *See* U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008), *available at* https://www.justice.gov/media/1173461/dl?inline (last visited Feb. 20, 2026). For the Court's convenience, the three documents are provided herein as 2d Neff Decl., Exs. 6-8.

paper or record comes within this broad statutory classification of 'all records and papers … relating to any … act requisite to voting'…." *Id.*

Nevertheless, Movants argue that state statutes governing privacy of voter registration records to support their argument that only a publicly available version of Hawaii's SVRL is required. *See* Def.'s Mot., Doc. 53-1 at 20-21; Intervenors' Mot., Doc. 52 at 16-20. The statutory text of Title III itself makes clear that the records that must be produced under the CRA are not limited to only those that are public. Section 304 of the CRA explicitly requires the nondisclosure of records produced to the Attorney General under the Act:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. Section 304's privacy protection only has meaning if the records covered by the CRA include non-public information. Yet, Movants ignore the plain language of Section 304 and ask the Court to do the same by rewriting the CRA to exclude all non-public records and information.[12] Congress rejected the position that they advance

---

[12] Defendant argues that *Lynd* limits disclosures under Title III to public records and was never intended to provide access to confidential information. *See* Def.'s Mot., Doc. 53-1 at 14. The *Lynd* Court explained that a five-month delay in providing access to the voter list there was not acceptable because the list was a public record. Unredacted data was not at issue in *Lynd,* nor did it say that Title III does not provide

by its broad reference to "all records and papers." 52 U.S.C. § 20701. In sharp contrast, where Congress intended to require a smaller class of records to be produced in a statute, it has said so. *See* 52 U.S.C. § 20507(i) (providing in the NVRA that voter records to be produced to the public for assessment of list maintenance "shall include lists of the names and addresses" of voters sent confirmation notices and any responses). To put it succinctly: Section 301 means what it says in requiring production of "all records and papers" relating to registration to vote in a federal election, including Hawaii's SVRL. 52 U.S.C. § 20701. As *Lynd* made clear, "All means all." 306 F.2d at 230.

As explained above, state statutes are preempted when there is a conflict. Here, the only way that the Attorney General can assess whether Hawaii is actually collecting the driver's license and SSN4 information required by 52 U.S.C. 21083(a)(5)(A) on the voter registration application is to examine those election records. That information is not provided in the redacted or public voter list.[13] There is no question that enforcement of the list maintenance requirements of HAVA is for "the purpose of investigating possible violations of a Federal statute." *See Coleman II*, 313 F.2d at 868; *cf. Morton Salt*, 338 U.S. at 642-43 (confirming compliance with federal law is a legitimate purpose). When there is

---

access to confidential information. *Lynd*, 306 F.2d at 231.

[13] If the Movants' position were to be adopted, it would eviscerate HAVA enforcement of 52 U.S.C. 21083(a)(5)(A) and list maintenance in general. The Attorney General can only meaningfully investigate and enforce list maintenance requirements under HAVA by having access to the voter identification numbers required by federal law. As explained above, that information is necessary to identify duplicate registration records, registrants who have moved, and registrants who have died, or who are otherwise no longer eligible to vote in federal elections. *See supra* Part III(B).

a conflict between federal enforcement and state law, then state law must yield.  *See Foster*, 522 U.S. at 69 and *supra* at 9-10.

But that does not mean the privacy of Hawaii voters is not protected.  Section 304 and the Privacy Act provide privacy protections to voters. The unredacted SVRL and other responsive federal election records can certainly be produced to the United States through a protective order.[14] *Lynd*, 306 F.2d at 230.

Moreover, the data the United States has requested under the CRA is the same that twenty-five states (not including Hawaii) and the District of Columbia routinely share through the Electronic Registration Information Center, ("ERIC"), to facilitate their compliance with federal list-maintenance requirements.[15] Similarly, private parties have been granted access to even more detailed voter data than what the United States has requested where necessary to bring actions to enforce federal rights, including one such recent case in this District Court. *See Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937, at *2 (D.N.H. May 27, 2025) (ACLU compelled production of "[a] copy of the New Hampshire statewide voter database and all documents concerning the use of the statewide voter database"), *appeal dismissed sub nom. Coal for Open*

---

[14] Consistent with this approach to address any reasonable privacy concerns without impeding the Attorney General's authority to enforce federal law, the United States has offered all states a memorandum of understanding, or MOU, memorializing these requirements. *See* 2d Neff Decl. ¶¶ 15-16. As of February 20, 2026, twelve states have provided their SVRLs without any MOU. 2d Neff Decl. ¶ 16. Two states have agreed to provide their SVRL under the terms of the MOU. *Id*.

[15] *See* ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited Mar. 5, 2026).

*Democracy v. Formella*, 23-1585, 2025 WL 3786144 (1st Cir. July 2, 2025). Accordingly, the United States is entitled to reproduction and copying of Hawaii's unredacted electronic SVRL under the unambiguous language of Section 303 of the CRA. *See* 52 U.S.C. § 20703; *see also Gallion*, 187 F. Supp. at 855-56 (granting Attorney General request); *Lynd*, 306 F.2d at 226 (same).

## IV.  THE UNITED STATES IS COMPLYING WITH FEDERAL PRIVACY LAWS

Movants make a variety of arguments that privacy laws require dismissal of the United States' efforts to compel production of Hawaii's federal election records. *See* Defs.' Mot., Doc. 53-1 at 21-25; Intervenors' Mot., Doc. 52 at 16-24. Those arguments are misguided at best. The United States does not dispute that the requirements of the Privacy Act and Section 304 of the CRA apply here, and it is complying with those requirements. The First Amendment does not prohibit the collection of voter information by the United States to assess compliance with HAVA. The requirement for a Privacy Impact Assessment under E-Government Act does not apply to the investigation of Hawaii's list maintenance practices being conducted by the United States under HAVA.

### A.    The United States is complying with the Privacy Act.

Movants argue that the United States must comply with the Privacy Act, and the United States is doing that. But Movants go even further, contending that the Complaint must be dismissed "to protect Hawaiʻi residents' fundamental privacy and voting rights." Defs.' Mot., Doc. 53 at 2; *see also* Intervenors' Mot., Doc. 52 at 16-20. Not surprisingly,

however, there is no requirement in federal law requiring that the United States plead its compliance with the Privacy Act in every complaint it brings in which it may obtain records that contain personally identifiable information. Rather, the Privacy Act and Section 304 of the CRA simply require that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use.

The voter information that the United States is collecting is maintained according to the Privacy Act protections explained in the Department of Justice, Civil Rights Division's Privacy Policy, which it has published online. The full list of routine uses for this collection of information, which include investigations and enforcement actions, can be found in the Department of Justice's systems of records notices ("SORN"), most of which are identified with their citations in U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in a table at pages 24,148 to 24,151.

The statutes cited for routine use include HAVA, the NVRA, and the CRA, as described in note 16 of the Department of Justice's Privacy Policy. The United States made its requests pursuant to those statutes. *See* Exs. 1, 3 to Doc. 5-2. The records in the system of records are kept under authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

Similarly, to the extent that Movants are concerned about the transport of such data to the United States, the Department of Justice uses a secure file-sharing system, Justice

Enterprise File Sharing ("JEFS"). That system implements strict access controls to ensure that each user can only access their own files and is also covered by SORNs.

Moreover, the Privacy Act does not bar the disclosure of Hawaii's SVRL to the United States, as Movants contend. Def.'s Mot., Doc. 53-1 at 22. Intervenor's Mot., Doc. 52 at 20 The Privacy Act regulates federal agencies' collection, maintenance, and disclosure of information within their own systems of records—it does not restrict the ability of state actors to share information with federal agencies. The statute's plain language confirms that it applies only to federal "agencies" as defined in 5 U.S.C. § 552a(a)(1), meaning "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government." State and local entities fall outside that definition. The Privacy Act "erects certain safeguards for an individual against an invasion of personal privacy," Pub. L. No. 93–579, § 2(b), 88 Stat. 1896 (1974), only within the scope of federal agency record systems. There is no basis for Officer Nago to fail or refuse to disclose information to a federal agency for law enforcement purposes, particularly here, where the United States is complying with the provisions of the Privacy Act.

## B.    The First Amendment does not prohibit access to data the United States needs for its HAVA claim.

The United States is not violating 5 U.S.C. § 552a(e)(7) of the Privacy Act by requesting Hawaii's SVRL. Defendant contends that voter registration data the United States seeks is a form of political expression protected by the First Amendment and

implicates a statutory bar to collecting such data. Def.'s Mot., Doc. 53-1 at 23. But Defendant misses the mark. Without question, voting and registration implicate speech and actions protected under the First Amendment. But that does not foreclose the United States from enforcing federal election laws like HAVA and the CRA. Likewise, the United States may use those records to assess whether Hawaii is in compliance with Section 303 of HAVA by obtaining the required identifying numbers and whether it is engaging in reasonable list maintenance practices. Indeed, application of Defendant's argument would effectively prevent the Voting Section of the Civil Rights Division from engaging in any investigations or enforcement actions at all. That plainly is not what Congress intended.

### C.   The E-Government Act does not prevent the United States from obtaining data supporting its HAVA claim.

Defendant next argues that the demand for production of Hawaii's SVRL and other federal election records violates the E-Government Act because the United States is required to conduct a "privacy impact assessment," or "PIA," before initiating investigations of each state's compliance with HAVA. *See* Def.'s Mot., Doc. 53-1 at 24. Again, neither the E-Government Act nor interpretative case law support their assertion.

The E-Government Act neither authorizes dismissal of this case nor limits the United States' ability to bring suit. The E-Government Act is not applicable to the United States' enforcement of HAVA and the CRA. The United States is not initiating a new process whereby it is contacting individuals for information as contemplated by Pub. L. No. 107–347, § 208(b)(1)(A)(ii)(II), which "includes any information in an identifiable form

permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government." The request is made to Officer Nago to provide a voter registration list already maintained pursuant to federal law to analyze Hawaii's federally required list maintenance. The SVRL would be kept on a system for which a Privacy Impact Assessment has been done.[16] Only when a new system is established—not when each new data request is made—is a Privacy Impact Assessment required.[17]

Applying the E-Government Act to enforcement of voting statutes would lead to an absurd result in which thousands of Privacy Impact Assessments would have to be done whenever the Voting Section gathers any voter data to enforce the Voting Rights Act, NVRA, HAVA, or the Uniform and Overseas Citizens Voting Act. Nothing in the E-Government Act suggests it was meant to encompass the enforcement provisions of all voting laws where voter data is examined. *See* Pub. L. No. 107–347, § 208(a).

---

[16] An Initial Privacy Assessment (IPA) Determination was issued on October 12, 2012, showing that no Privacy Impact Assessment is required for the Justice Consolidated Office Network (JCON) system where personal identifying information associated with the United States' CRA demand is stored. *See* 2d Neff Decl. ¶ 17.

[17] When the Civil Rights Division began using ServiceNow (SNOW), a FedRAMP High-compliant Software as a Service (SaaS) cloud-hosting provider offering a suite of natively integrated applications designed to support Information Technology Service Management (ITSM), resource management, and shared support services, it prepared a Privacy Act Assessment ("PIA") as required by the E-Government Act. *See* Office of Privacy & Civ. Liberties, DOJ Privacy Impact Assessments, *available at* https://www.justice.gov/opcl/doj-privacy-impact-assessments (last visited Feb. 20, 2026).

**D.     The Driver's Privacy Protection Act does not allow Officer Nago to deny the United States list maintenance data.**

Defendant's contention that the Attorney General's demand violates the Driver's Privacy Protection Act ("DPPA") also fails.  Def. Mot. Doc. 53-1 at 24-25.  The DPPA generally prohibits the disclosure of "personal information" obtained by a state Department of Motor Vehicles in connection with a motor vehicle record. *See* 18 U.S.C. §§ 2721(a), 2725(1), (3), (4). Nonetheless, the statute explicitly contains exceptions that permit certain governmental uses. Under 18 U.S.C. § 2721(b)(1), disclosure is allowed "for use by any government agency … in carrying out its functions," including law enforcement or other regulatory enforcement purposes. This statutory language demonstrates that the DPPA was not intended to block all government access to DMV records.

The DPPA's prohibition is clearly not implicated in the present case. The Department of Justice is a government agency performing a statutorily mandated function—verifying voter registration records and associated list maintenance activities by state and local entities. Under the governmental-function exemption in § 2721(b)(1), the United States' use of DMV-provided information is permissible, even though the information originates from a motor vehicle record.  Transfers of DMV data to government agencies for official functions, including voter registration administration, are therefore consistent with the DPPA and fall squarely within the statute's exceptions.

## V.    CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant its Motion to Compel Production of federal election records under Section 305 of the CRA (Doc. 5) and deny Movants' Motions to Dismiss (Doc. 52 and Doc. 53).

DATED: March 6, 2026.                    HARMEET K. DHILLON
                                         Assistant Attorney General
                                         Civil Rights Division

                                         ROBERT J. KEENAN
                                         Acting Deputy Assistant Attorney General
                                         Civil Rights Division

                                         ERIC V. NEFF
                                         Acting Chief, Voting Section
                                         Civil Rights Division


                                         /s/ *Brittany E. Bennett*
                                         BRITTANY E. BENNETT
                                         CHRISTOPHER J. GARDNER
                                         Trial Attorneys, Voting Section
                                         Civil Rights Division
                                         U.S. Department of Justice
                                         4 Constitution Square
                                         150 M Street NE, Room 8.141
                                         Washington, D.C. 20002
                                         Telephone: (202) 704-5430
                                         Email: brittany.bennett@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 6, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ *Brittany E. Bennett*
BRITTANY E. BENNETT
CHRISTOPHER J. GARDNER
Trial Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Email: brittany.bennett@usdoj.gov

41